June, 1809.

COLEMAN
v.
WOLCOTT.

WILLIAM COLEMAN *against* ALEXANDER WOLCOTT.

A sum of money being due from *A.* to *B.* and *C.* jointly, by virtue of a covenant entered into between them on the one part, and *A.* on the other; *B.* assigned his interest in the covenant to *D.*; after which *A.* with intent to defraud *C.*, and knowing that *B.* was totally insolvent, applied to the latter, and procured from him a release of the covenant, and then pleaded it in bar of an action on the covenant, whereupon that action was withdrawn: Held, that this was an injury to *C.* or which he was entitled to recover at law against *A.*

To render the injury actionable in such case, it is not necessary that there should have been a judgment on the release pleaded in bar.

WRIT of error.

This was an action on the case.

The declaration stated, that on the 4th of *September*, 1795, the plaintiff and *John Taylor* entered into a contract in writing, with the defendant, of that date, which was duly executed under hand and seal, and had become lost by time and some unforeseen inevitable casualty, the counterpart whereof was then in the hands of the defendant, and of the tenor set forth. From the recited covenant it appeared, that the plaintiff and *Taylor*, on the one part, and the defendant, on the other, covenanted, that, whereas the defendant had discovered that there was a tract of land in *Virginia*, within the *Louisa-Forks* of the river *Sandy*, supposed to be unlocated, and the property of that state, and that the plaintiff and *Taylor* were desirous of obtaining 200,000 acres thereof, and of the assistance of the defendant in procuring a title to the same; wherefore it was agreed, that on or before the 6th of said *September*, the plaintiff and *Taylor* would advance to the defendant six thousand dollars, being three cents per acre for each of 200,000 acres of land; that on or before the first of *January*, 1796, they would pay him one cent per acre more; that on or before the first of *January*, 1797, they would pay him three cents per acre more; and that on or before the first of *January*, 1798, they would pay him three cents per acre more, with the lawful interest after the first of *January*, 1797: And the defendant, on his part, covenanted, in consideration of the premises, that he would immediately proceed to *Richmond*, in *Virginia*, and make all necessary inquiries relating to said tract of land, and if it should appear that the land was not located or purchased, that he would proceed to locate and sur-

3

vey for the plaintiff and *Taylor* 200,000 acres, part of said tract, and as soon as might be, procure, at his own expense, a grant or patent from the State of *Virginia*, to the plaintiff and *Taylor*, or such person as they should appoint; and in case the defendant should find part of the above tract located, he agreed to interest the plaintiff and *Taylor* in a certain proportion of the residue; but, if the defendant should find that the whole of said tract had been located, then he covenanted, so soon as the same conveniently could be done, to return to the plaintiff and *Taylor* the whole of the money advanced by them, without expense or deduction; and it was agreed that no further sums should afterwards be paid to him. It was further agreed, that if the defendant should find the said tract wholly or in part unlocated, and should proceed to survey and locate the same, and the plaintiff and *Taylor* should neglect or refuse to advance one cent per acre by the first day of *January*, 1796, then the defendant should be at full liberty, at any time within a month after said first of *January*, to repay to the plaintiff and *Taylor* the moneys advanced to him with interest, and be thenceforth exonerated from his covenant.

The declaration then stated, that *no copartnership had ever subsisted between the plaintiff and Taylor, and that they had agreed to hold each for himself an equal part of the land, to be sold for the separate benefit of each, and not for their joint advantage:* that the plaintiff and *Taylor* paid to the defendant, on the 6th of *September*, 1795, the six thousand dollars in the agreement stipulated, three thousand dollars of which was the proper money of the plaintiff: that on the 12th of *November*, 1795, *Taylor*, by a writing under his hand, well executed, relinquished, assigned and made over to *Eliel Gilbert* all his right, title, interest and claim in and to said covenant, meaning thereby to assign one moiety thereof, and at the same time, the plaintiff assigned and

June, 1809.

COLEMAN
v.
WOLCOTT.

made over to *Gilbert*, by a writing under his hand, all his right, claim and interest in the covenant, *except as to one third part thereof, which the plaintiff retained to and for his own use;* by virtue of which assignments, (which were entered on the original covenant,) *Taylor devested himself of all his right and title in the covenant,* of all which the defendant had full knowledge, on the first of *January*, 1796, and since has settled with *Gilbert*, and paid him to his full satisfaction for the two third parts of said contract assigned, and has been discharged therefrom, by a receipt in writing, executed by *Gilbert*, to the defendant, in full for all the right and title which *Gilbert* had in and to the contract.

The plaintiff further stated, that on the 2d of *January*, 1796, he paid the defendant·five hundred dollars on account of his third part of the covenant retained; and, on the 8th of the *April* succeeding, he paid to the defendant four hundred and fifty-eight dollars and fifty cents more, for the same purpose.

It was then averred, that the defendant never did procure any title, grant, or patent to all or any part of the lands mentioned in the covenant, they, since the date of the covenant, never having been the property of the State of *Virginia*: that in consequence of this failure of the defendant, he became liable to repay to the plaintiff the moneys advanced by him as aforesaid, amounting to 2,958 dollars and 50 cents: that on the 1st of *May*, 1796, and at divers times since, the plaintiff made demand of the money from the defendant, but he had ever neglected and refused to make payment.

It was further averred, that on the 15th of *February*, 1801, the defendant, knowing the premises, and conscious of the plaintiff's rights, applied to the plaintiff in *New-York*, and *requested him to receive land* (not comprised within said covenant) *of the defendant in satisfaction for the money paid upon the plaintiff's one third part of the contract aforesaid;* with which the

plaintiff refused to comply : that on the 14th of *May*,
1801, "*the said John Taylor*, being then a *bankrupt*,
and *at all time since totally insolvent*, and *unable to
pay his debts*, and who owned no part of the recited con-
tract," " which the defendant, on said 14th of *May*, 1801,
well knew;" the premises notwithstanding, the defendant,
for the purpose of defrauding the plaintiff of the sums
advanced by him as aforesaid, applied to *Taylor*, and
for the fraudulent purpose aforesaid, procured a writing
under his hand, well executed, releasing and discharg-
ing the defendant from his covenant; which release he
has since pleaded in bar of an action commenced in the
name of *Coleman* and *Taylor* against him, on the cove-
nant of the original contract for the recovery of the
aforesaid sum of 2,958 dollars and 50 cents ; in conse-
quence of which, the plaintiffs withdrew their action,
and judgment was obtained by the defendant against
them.

The cause was tried to the jury on the general plea
of *not guilty*, and a verdict was returned against the de-
fendant, finding him *guilty*, and for the plaintiff to re-
cover 5,222 dollars damages.

There was a motion in arrest, consisting of two ob-
jections; one *of fact*, which was found not to be true;
the other of *law*, that the plaintiff's declaration was in-
sufficient.

The court adjudged the declaration insufficient; and
rendered judgment for the defendant.

*Hosmer* and *Dwight*, for the plaintiff. The judgment
of the superior court in favour of the defendant, pro-
ceeded exclusively on the ground that the plaintiff's
declaration was insufficient. After having concisely
stated the facts, we shall endeavour to show that they
authorize the suit at law, which the plaintiff has insti-
tuted. This general observation comprises two propo-
sitions : that the declaration of the plaintiff contains a

June, 1809. sufficient *cause of action;* and that a court of *law* is
COLEMAN competent to administer the proper redress.

v. It appears, that *Coleman* and *Taylor* entered into an
WOLCOTT. indenture of covenant with *A. Wolcott,* in which it was
stipulated, that they should make him certain payments,
and that he should procure for them a title to a quan-
tity of land in *Virginia.* They paid him six thousand
dollars, one half of which was the property of *Coleman.*
It is found, that there was no copartnership between
*Coleman* and *Taylor;* and within a few weeks after the
covenant was entered into, that *Taylor* assigned all his
right in it to *Eliel Gilbert.* *Coleman,* likewise, assigned
a part of his right in it, retaining one third only for him-
self; *after which,* he paid to *Wolcott* nearly a thousand
dollars on this reservation. Between *Gilbert* and *Cole-
man* there was no connection. *Wolcott,* who had totally
failed in the performance of his engagement, made a
settlement with *Gilbert* for his two third parts of the
money paid on the covenant, and took his discharge.
From this moment it is indisputably apparent, that *Gil-
bert had no interest in the covenant;* that *Taylor had no
interest in it,* and that *Coleman was really the only per-
son who had any equitable claim to the one third of the
money still remaining due.* In *February,* 1801, *Wolcott,*
acquainted with all the preceding facts, and fully conscious
of the rights of *Coleman,* applied to him, and requested
him to receive certain lands, in satisfaction for the money
paid on his third part of the contract. This was five or six
years after he, by the infraction of his covenant, was
under obligation to make restitution of the money. It
will occur to the court, that by this proceeding, *Wolcott*
explicitly recognised the right of *Coleman;* and that the
sum remaining unpaid was his exclusively. In reply
to *Wolcott's* proposition, *Coleman* refused to receive
lands which he was under no obligation to receive, and
merely insisted on the repayment of money which he
had injuriously been deprived of, for a number of years.

After *Wolcott* had found that his wild lands would not pay a money debt, he, on the 14th of *May*, three months only posterior to his recognition of *Coleman's* claim, applied to *Taylor*, to procure a release of it. At this time, *Taylor* was insolvent, and *was known* to be so by *Wolcott*. He likewise *knew*, as has been mentioned, that *Taylor* had no interest in the covenant, except what was merely nominal. For the purpose of defrauding *Coleman* of the sums by him advanced, this application to *Taylor*, it is found, was made; and in execution of this fraudulent purpose, he procured a release from *Taylor*, discharging him from his covenant. Whether the release thus obtained was procured for a valuable consideration, or was gratuitous, does not appear; nor is it of the least moment that it should. After this, *Coleman* instituted a suit upon the covenant in the name of *Taylor* and himself, and *Wolcott* pleaded the release in bar. The action was withdrawn on the belief that the plea must be available, and that a replication of *per fraudem* would be nugatory, for this, among other reasons, that *Taylor* could not, in this manner, invalidate his own act. The plaintiff has now brought an action on the case, founded on the preceding facts, and demands *damages*, which are not merely presumptive, but inevitable, as the release is an insurmountable impediment to any recovery upon the covenant. The verdict of the jury was for the plaintiff; but it was considered by the court, that the facts averred and found did not authorize a judgment in his favour.

1. Our first proposition is, that the plaintiff had a *right* to the one third part of the money paid to *Wolcott*, *which a court of law will recognise.* We are fully aware that no part of this assertion will be admitted. It has been insisted, that the plaintiff had no right to the money *in equity*, *or at law;* and particularly on this principle, that the release of one of two joint obligees, enured not only totally to extinguish the cause of

action on the obligation, but utterly to annihilate it, in prevention of all collateral inquiries. This will receive due attention, in the course of argument. We will first inquire whether the plaintiff had not an *equitable* right to the one third part of the money paid on the covenant. If by · *equity* · be meant *natural justice*, the question is determined, so soon as the terms of it are understood. For what can be more obviously just, than that the plaintiff should have restitution made him *of his own money ?* It would be manifestly unjust that . *Taylor*, who had transferred all his right to *Gilbert*, should receive any part of it. The claim of *Gilbert* is, if possible, more unfounded. The two thirds assigned to him had been paid, and he had released all demands. It results conclusively, that the plaintiff, and the plaintiff alone, has an equitable claim for the sum remaining due. Of this opinion was the defendant, when he made application to him, requesting him to receive lands in payment.

But the expression *equitable right*, if it is considered as referring to the principles adopted in chancery, is equally predicable of the plaintiff's claim. It is past all question, that if, after an obligation has been assigned, which alone is transferable in equity, the promissor, with notice of this fact, takes a release from the insolvent obligee, he may in chancery be compelled to pay the money to the assignee. 1 *Ves.* 332. 391. 2 *Ves.* 6. 1 *Pow. on Cont.* 317. 1 Ld. *Raym.* 683. 2 *Vern.* 595. *Baldwin* v. *Billingsley*, 2 *Vern.* 540. 3 *Chan. Rep.* 41. *Chan. Cas.* 232. 2 *P. Wms.* 608. 1 *Root*, 349. *Russel* v. *Cornwell*, 2 *Root*, 122. *Master* v. *Miller*, 4 *Term Rep.* 341. This principle has been long established in *Westminster-Hall*, and was the unquestionable rule here, until the courts of law exercised jurisdiction in cases of this description. The foundation of the principle was this, that the assignee of the bond was alone beneficially interested in it; or, in other words, he was the sole equitable proprietor. Whether the equitable owner was

originally interested in the debt, or became interested at
a time posterior, was deemed of no consequence. "It is
not material" (says Justice *Ashhurst*, in *Winch* v. *Keeley*,
1 *Term Rep.* 623.) "at what time he became a trustee;
for whether he became such by the assignment, or was
so originally, it is sufficient to say that he is a trustee
now." It may, likewise, be observed, that it matters
not by what act, or in what manner, a person has be-
come the equitable owner of a bond. If the nominal·
party to a contract has really no interest in it, he is
merely a trustee for the person beneficially interested.
This position, that the plaintiff was the *equitable* owner
of the money in the defendant's hands, is too obviously
clear to require further argument.

The important question remains, whether the *right* of
the plaintiff is merely equitable, and to be vindica-
ted in a court of chancery only, or whether it is a
right which a court of law may recognise, and for the
privation of which it may administer redress. It only
remains to show (what is unquestionably clear) that the
courts of law in this state for many years, have admi-
nistered justice to *the assignee* of a note, or *the real
owner*, in cases of the description referred to. But,
it may not be entirely unsatisfactory to discuss the ques-
tion on broader ground, and unfold the peculiar pro-
priety of exercising legal jurisdiction in the matter re-
ferred to.

We begin with stating a fact, that at an early period
of the *English* history, the principles of law were few,
and the modes of proceeding simple. The *stat. of Westm.*
2. the parent of actions on the case, gave power to the
clerks in chancery, when there was no former writ, to
make one adapted to the exigencies of the complainant's
case. But notwithstanding this, the court of chancery,
partly from usurpation, and partly from a necessity im-
posed by the illiberality of the law courts, took jurisdic-
tion of suits, and granted relief on principles of natural

justice. Without particularly tracing the progress of its jurisdiction, suffice it to observe, that, at length, from the smallest beginnings, it extended its cognisance to numerous cases, and administered justice most extensively. When the line of its jurisdiction became accurately defined, it granted relief principally in the following instances: 1. It interposed *to give a remedy*, which the courts of common law were unable to do, and on principles of established law; 2. It restrained a party from availing himself of an advantage, which he had obtained by fraud, accident, or otherwise, in courts of ordinary jurisdiction, or out of them; 3. It administered *right* on *principles of natural and universal justice*, when the ordinary courts had not, as yet, adopted any rule on the subject. From the latter principle, it is obviously apparent, that the courts of chancery would originate many new rules; and this has been the fact. But this is not all. Having once adopted a principle, it became a precedent, adhered to as tenaciously as the decisions of the other courts. 3 *Bl. Com.* 432. *Mitford*, 4. It is unquestionably true, after the *stat. of Westm.* 2. had authorized the clerks in chancery to frame such writs as the public exigency might require, that " with a little accuracy in the clerks, and a little liberality in the judges, by extending rather than narrowing the remedial effects of the writ, this provision might have effectually answered all the purposes of a court of equity; except that of obtaining a discovery by the oath of the defendant." 3 *Bl. Com.* 51. This object has in part been obtained, and is constantly verging towards the desired point, by the recognition of the established rules of the court of chancery, in courts of common law. Why should they not thus be adopted, and naturalized in the legal code, when the objection to them is reduced to matter of mere form? " The rules of both courts should be exactly the same: both ought to adopt the best, or must cease to be courts of justice." " When

the subject matter is such as requires to be determined *secundum æquum et bonum*, as generally upon actions on the case, the judgments of the courts of law are guided by the most liberal equity." 3 *Bl. Com.* 435. The absurdity of different rules in courts of law and chancery is extremely glaring. "That one court should have a jurisdiction according to strict law, and another according to equity; that the former should be obliged, with eyes open, to pronounce an unjust sentence, in conformity to an old rule, leaving parties to procure relief by an application to the latter; that, in a word, the common law tribunal should be empowered to view the lawsuit only on one side, and the court of equity upon a different one; such a regulation appears in itself no less absurd and ridiculous, than its consequences would be hurtful, by producing a waste of time, and an accumulation of expenses: not to mention the uncertainty and fluctuation of conduct arising from the inaccurate and variable boundaries by which equity and strict law must ever be distinguished." *Millar's Historical View of the English Government, p.* 433.

Of late years, the liberality with which courts of common law have noticed and adopted the principles of decision established in the courts of equity, has been of eminent use, by amplifying their jurisdiction, and rendering the ordinary courts more nearly adequate to the public exigencies. This is the natural progression of things. "The distinction between strict law and equity is never, in any country, a permanent distinction. It varies according to the state of property, the improvement of arts, the experience of judges, the refinement of a people." *Mitf.* 428. "Law and equity are in continual progression; and the former is constantly gaining ground upon the latter. A great part of what is now strict law was formerly considered as equity; and the equitable decisions of this age will unavoidably be ranked under the strict law of the next." *Mitf.* 431. At

June, 1809.

COLEMAN
v.
WOLCOTT.

the same time we would not be understood to assert, that every rule practised on in chancery, should be naturalized in the law courts. Undoubtedly there is an exception in some cases, in which the relief administered is not absolute, but conditional, and where the conditional relief is *essential* to the administration of justice. 7 *Term Rep.* 667.

The result of the observations just submitted is, that courts of chancery adhere to rules adopted by them, as tenaciously as the courts of law to theirs; and that much of what was chancery law formerly, is now the established law of the ordinary courts. In *Westminster-Hall*, it is well known that the law on the subject of assigned *choses in action* (though suits are not yet sustained in the ordinary courts upon them in favour of the assignee) has greatly altered, and that this alteration has been adopted from the rules established in the courts of chancery. In the case of *Master et al.* v. *Miller*, 4 *Term Rep.* 340. a masterly view of this subject is taken by Justice *Buller.* The ancient doctrine was, that *for avoiding maintenance*, a *chose in action* could not be assigned. The good sense of this rule is not only questionable, but is in the teeth of all experience. Courts of law soon altered their language on the subject very much. In *The King* v. *Aickles*, 12 *Mod.* 554. (A. D. 1701,) it was said, " that though the thing in its nature was not assignable, yet it was enough to bind the assignor, to suffer the assignee to enjoy it." This was the first step towards the recognition of the assignee's right by courts of law. The assignment of a *chose in action* has always been held a good consideration for a promise. 4 *Term Rep.* 341. In *Bottomley* v. *Brook*, *Rudge* v. *Birch*, cited 1 *Term Rep.* 621. and 4 *Term Rep.* 341. and in *Winch* v. *Keeley*, 1 *Term Rep.* 619. the right of the *cestui que trust* and assignee has been acknowledged, and acted upon, and relief granted in the ordinary courts. In *Fenner* v. *Meares*, 2 *Bla. Rep.* 1272. the suit on a

respondentia bond assigned was sustained in favour of the assignee. " But still, (says Justice *Buller*,) it must be admitted, that though the courts of law have gone the length of taking notice of assignments of *choses in action*, and of acting upon them, yet in many cases they have adhered to the sound objection, that the action shall be brought in the name of the assignor, and not in the name of the assignee. I see no use or convenience in preserving that shadow, when the substance is gone." *4 Term Rep.* 341.

In this state, the decisions of our courts, until about 14 years since, were similar to those of *Westminster Hall.* The rights of the assignee were vindicated in chancery. In *July*, 1794, the case of *Russel* v. *Cornwell* (2. *Root*, 122.) was heard in *Middlesex* county. It was a petition in chancery brought by the assignee of a promissory note against the promissor, who, with notice of the assignment, had taken a release from the assignor. The court of common pleas had decreed for the petitioner ; this had been reversed, and the cause entered in the superior court. It was insisted, that there was remedy at law. The court observed, that " on hearing the arguments in this case, they were inclined to think, that the petitioner *might have an action at law for the fraud to recover his damages;* but as this case was entered in this court upon reversal, and the *precedents had ever been to grant relief in chancery in such cases*, they thought it would not do to turn the petitioner round, and send him to law upon an uncertainty, as there had been no decisions of the kind. They, therefore, sustained the petition."

It is a deduction well warranted from this case, that the court had brought their minds to this point, that *a court of law was competent to administer redress in such cases.* This principle was soon after recognised, and has since been followed up by various determinations; so that the question, if there is any stability in jurispru-

dence, may be considered at rest, and the repeated decision of the point, as establishing a land-mark for time to come. (1 *Root*, 561.)

In the case of *Booth* v. *Warner*, (*anno* 1797, *superior court, Litchfield county*,) the point was directly and explicitly decided. It was a petition in chancery. *Booth*, the petitioner, was the assignee of a bond given to *Van Wagoner* by the defendant. *After notice* of the assignment, and of the bankruptcy of *Van Wagoner*, the defendant obtained from him a release of the obligation. The object of the petition was to enforce a payment of the money, the release notwithstanding; but it was dismissed on this *sole ground*, that there was adequate remedy at law. From that determination to the present time, with the exception of the case in hearing, the decisions have been frequent and uniform. It has been a thing *of course* to sustain actions at law for the redress of similar injuries.

How much preferable is this to the awkward shifts and refinements recurred to in *Westminster Hall*, to prevent the perpetration of injustice. If the obligor of a bond, after notice of assignment, take a release from the obligee, and plead it to the action brought in the obligee's name, the *court will set aside the plea ;* (1 *Bos. & Pull.* 447.) will order the release given up; (*Doug.* 391.) will commit for a contempt. (*Salk.* 260  7 *Term Rep.* 669.) This is all the court can do ; so that the defendant, if he persist in his plea, is victorious over the courts. The courts, in these cases, *recognise the right* of the assignee, and *endeavour to advance a remedy.* Why should they not adopt one adequate to the object, and not expose themselves to the disgrace of an unsuccessful competition, and justice to the peril of a defeat. We are aware, that in a neighbouring state, the rights of an assignee have been acknowledged in a court of law, and a release, after notice of the assignment, has been adjudged a nullity. *Wardell* v. *Eden*,

1 *Johns.* 531. *Littlefield* v. *Story*, 3 *Johns.* 425. The objections to this proceeding are both obvious and cogent. If the assignee is *the admitted* party to the contract, or the *acknowledged proprietor*, why not sue in his name? If he is not, why regard his equitable property, in opposition to the legal rights of the assignor? Whence comes it, that in a court of law, the *equitable* right controls the legal? How incongruous, how inconsistent, that the assignee should voluntarily sue in the name of another, *by this act asserting his legal and unquestionable right*, and in the progress of the same suit, be permitted to deny it! How improper, that the records of the court should, in one sentence, have been evidence of the plaintiff's *right;* in the next, despoil him of his right; and in the last, by rendering judgment in his favour, establish his right as of incontrollable verity! This absurdity is avoided by adopting the rule of practice, for which we contend, permitting the assignee, who has right, to sue in his own name. The rule that he who is plaintiff in a suit has *the right*, is fundamental, and cannot be departed from, without producing the most palpable absurdity. And where a court has gone the length of recognising *the right*, why not take the second step, and assert the *remedy* in the usual manner?

We are authorized, then, to affirm it to have been the law of this state, settled for a number of years, " that the assignee of a promissory note may maintain an action of fraud against the promissor, for accepting a discharge from the promissee, after notice of the assignment," and that it has been acted on *over and over again*. If there be any *novelty* on this subject, it is in this *new* endeavour, to bring back to chancery cognisance that class of cases, which has been emancipated from its jurisdiction, and naturalized in the ordinary courts.

The superior court, as a legal tribunal, has recently

determined a case, in point of essential principle, very similar to the principal case now before this court. We allude to the action of *Storer* against *Bulkley et al.* To specify all the facts must be unnecessary. Suffice it to observe, that the suit was founded in a fraud practised on the plaintiff, by the defendant's attaining a release from one *Bontecou*, on false representations. The plaintiff's *title*, defeated by the deed, (the only subject on which an inquiry need be made,) was this: he had given a deed of land to *Bontecou* in fee-simple, relying on a *parol agreement* that the grantee would release the land, on payment of the sum for which it was granted. His reliance was on *Bontecou's honour*, and his only mode of enforcing his claim was by a suit in chancery, applying to *Bontecou's conscience* for the truth. The *fact* of the agreement by *Bontecou* was denied, and an objection was made to the admission of parol evidence to substantiate it. The court, however, admitted it, and, in charging the jury, said, "that if the defendants obtained the deed from *Bontecou* by fraud, they were liable in this action, though the agreement between *Bontecou* and the plaintiff to recover the land vested in parol, and depended on the honour of *Bontecou*." The *supreme court of errors* concurred in opinion, and affirmed the judgment in this case. 2 *Day*, 531.

Let the cases be compared. They were actions of fraud; in both of them, the plaintiffs were defeated by the deceit of the defendant; in both actions, the plaintiffs had *equitable rights*, and for the privation of these, suits at law are brought. Where, then, is the difference? If there be any, it is in favour of *Coleman*. His right, as against *Wolcott*, was *legal* as well as equitable; and *Taylor*, a trustee merely, was induced by *Wolcott* to violate his trust, and execute a release.

On the whole, we conclude on this point, that the plaintiff has a right to the money in the defendant's hands, which a court of law will recognise and enforce.

Our next proposition is, that the plaintiff sustained
a *damage* in consequence of the fraud practised by the
defendant. This is a necessary ingredient in this suit.
It is not denied that *damage* must exist as well as
fraud.

But we insist, that in this case, there has been
" *damage*" to the plaintiff. If it were necessary to show
*actual damage*, this most abundantly appears. The
pleading the release and frustrating the plaintiff's suit;
burdening him with expense; taking judgment against
him for the cost; and *delaying* his demand, all prove *actual damage*.

The objection that no damage had been sustained,
would be somewhat singular *after verdict*. Whether
damage, or not, is *a fact*. This the jury have found,
and their finding is conclusive, unless it *necessarily* appears from the declaration that no damage could have
existed. Now, this never can appear, unless it is a legal prerequisite, that some *fact*, such as judgment on
the plea of release against the plaintiff, should appear,
before *damage* can be presumed. It is universally true,
that *privation of rights* infers, by necessary legal consequence, that *damages* have intervened. In trespass, *assumpsit*, case, or, indeed, actions of every description,
the observation will hold true. If *Taylor* were *solvent*,
perhaps no action would lie against *Wolcott;* not because there *was no damages* in fact sustained by the
fraud, but because none could, by possibility, arise. But
*Taylor* being utterly insolvent, his release was necessarily accompanied *with damage*. And thus the decisions
have ever been. If the obligee, whose land has been assigned, is *a bankrupt*, he need not be sued ; the obligor
who accepts the discharge is responsible immediately.

It will, perhaps, be objected, that the plaintiff in the
same suit, might have *avoided* the plea, by replying *per
fraudem;* and hence, that there was *no damage*, except
what the plaintiff has voluntarily sustained. If this

June, 1809.

COLEMAN
v.
WOLCOTT.

were true, it would not follow as a necessary *consequence*, that no damage can be presumed. For what could he anticipate? If there were a recovery, his coplaintiff would discharge the judgment.

But how can *per fraudem* be replied by *a party to the fraud?* This objection to that mode of proceeding is insuperable. There was no fraud in fact, of which *Taylor* could complain; and *Coleman*, having joined with him in the suit, could be in no better condition than his coplaintiff. *Smith* v. *Bouchier*, 2 *Stra.* 993. *Philips* v. *Biron*, 1 *Stra.* 509.

Besides, the whole argument of the defendant proceeds on this ground, that the plaintiff was *bound to sue on the covenant*, an inference manifestly unfounded. If not bound to sue on the covenant, his condition is now precisely what it should be, to enable him to bring this action.

It is said, that if *A. forges* a note in the name of *B.* no action lies until *actual* damage has been suffered. Why so? For this obvious reason, that the law *presumes* no damage from *a forged* writing, because it is not *the act of the nominal party*. But it does not follow, that no damage is presumed from a *legal act*, which puts an insurmountable barrier in the way of recovering.

It will be further objected, that the action is misconceived; that it should have been *indebitatus assumpsit*, or an action on the covenant in the name of *Coleman* only. As to the first, it requires no answer. If *indebitatus assumpsit* lies, (which is by no means admitted,) it is not inconsistent with the assertion, that an action for fraud may likewise be sustained: As to the other part of the objection, is it true, that on a joint covenant, an action may be supported in the name of one of the covenantees solely? No. *Esp. Dig.* 247. 304. Where there is a *joint right*, there must be a joint action. " If the interest and cause of action be joint, the action must be brought by all the covenantees." "For when

6

June, 1809.

COLEMAN
v.
WOLCOTT.

there are several covenantees, and one of them only brings the action, without averring in the declaration, that the others are dead, the defendant may either take advantage of it on the trial, as a variance upon the plea of *non est factum*, or pray oyer of the deed, and demur generally." *Eccleston* v. *Clipsham*, 1 *Saund.* 154.

But an objection on which the defendant may place some reliance remains yet to be discussed. It will be said, that the release of *Taylor* to the defendant not only extinguished *the covenant*, but the whole *cause of action* upon it, so that no *demand, either at law, or in equity, remained against the defendant.* And truly, it is a most extraordinary objection ! If it be true, it irresistibly follows, that the release of the promissee of a note, after assignment, must cut off all possible redress in behalf of the assignee against the promissor.

What is the proof of this extraordinary position ? Why the same as that on which we rely as the gist of our action ; *that the covenant is extinguished.* If there are two joint executors, joint obligees, or joint covenantees, the release of one discharges the obligation. 18 *Vin. Abr.* 347, 348, 349, 350, 351. 353. But the question remains, whether it releases and annihilates the cause of action so completely, as to bar *all collateral rights ?* Does it extinguish it completely, and blot the memory of it from legal contemplation and existence ? Such an idea is repugnant to reason, and unsupported by authority.

*Daggett* and *Gould*, for the defendant, contended, first, that the remedy, if any, was not at law; and, secondly, that there was no remedy.

1. The plaintiff's right, if any, against *Wolcott*, is but an *equity*. The *gravamen* of this application is, that the plaintiff's *legal* right has been destroyed. How absurd is it to make such an application to a court of law ? Shall a party be heard in a court of law, when

June, 1809.

COLEMAN

v

WOLCOTT.

his only complaint is, that the defendant has availed himself of a *good defence* at law? It may have been very unrighteous in the defendant to avail himself of such defence; but when a court of law pronounces it a *good* defence, will the same court subject him for making it? It may be very unrighteous for a party to set up infancy, bankruptcy, or the statute of limitations, as a defence against a just demand; but could a court of law give a remedy against him for doing so?

The great argument in support of a legal jurisdiction in this case, is derived from a supposed analogy to the case of a discharge taken by the maker of a note from the payee, after notice of an assignment. In answer to this, it is to be observed, in the first place, that a court of law in *England* would not sustain such an action for a moment. As the assignee's interest is an *equity* only, he would be obliged to seek his remedy in chancery. Here, indeed, it would be otherwise, according to certain decisions; but let it be remembered, that those decisions form an *anomaly* in our system of jurisprudence. We have adopted, from the *English* system, separate jurisdictions in law and equity; and have also adopted the same general distinction between them. If we have confounded jurisdictions in one class of cases, it is rather a subject of regret, and a reason for future caution, than a ground for extending the confusion. Every innovation in jurisprudence is to be construed strictly, and watched with a jealous eye. It is much safest to stand *super antiquas vias*. In the next place, the analogy does not hold. There is *no unity of interest* between the payee and assignee, as there is between joint covenantees. The right of one is not that of the other.

But the case of *Storer* v. *Bulkley* is cited as an authority in point. *That* was for the violation of an *equitable* right. It is to be observed, however, that the agreement between *Storer* and *Bontecou* was as good *at law* as in equity. The statute of frauds and perjuries may

June, 1809.

COLEMAN
v.
WOLCOTT.

be pleaded in both. Besides, in that case, there was other special damage, such as bringing the plaintiff's creditors upon him, in pursuance of a conspiracy to ruin him in his business, &c.

The doctrine supposed to be established in *Winch* v. *Keeley,* 1 *Term Rep.* 619. that a court of law will take notice of a *trust*, so as to protect the interest of the *cestuy que trust*, is relied upon in support of this action. *That* was *indebitatus assumpsit;* the plea was, that the plaintiff became bankrupt, and his effects were assigned under the commission ; the replication alleged an assignment of the debt to a third person *before* the bankruptcy; and, on demurrer, the replication was held sufficient. The answer to this is, that the assignee's interest was recognised, not for the purpose of enforcing it against *the debtor*, but to determine whether the debt passed under the commission by the statute of 1 *Jac.* I. c. 15. The court were of opinion that this was not such a debt as passed under the commission; that the *legal* title was still in the plaintiff; and that he, therefore, was entitled to maintain the action. From the position, that he who has the *legal* title may maintain an action, we do not see how it is to be inferred, that he whose legal title is *gone*, can maintain one.

The remarks of Justice *Buller*, in *Master* v. *Miller*, 4 *Term Rep.* 340, 341. are extrajudicial, and opposed to the opinions of the other judges.

*Bottomley* v. *Brooke* was cited in *Winch* v. *Keeley*, and is relied upon by the plaintiff in this case. To debt on bond, the defendant pleaded it was given in trust for *E. Chancellor*, who was indebted to the defendant in a greater sum. This plea being demurred to, the court intimated an opinion in favour of the defendant ; and in *Rudge* v. *Birch*, soon afterwards, on the same pleadings, the defendant had judgment. This was only extending the principle of *Dutton* v. *Poole*, 1 *Vent*. 318. 332. *Allen* v. *Catlin*, cited 2 *Day*, 560, 561. and *Bishop* v.

*Drake, Kirby*, 378. But *Catlin* v. *Allen* was denied in *Sanford* v. *Sanford*, 2 *Day*, 559. And the general doctrine, that courts of *law* can take notice of *trusts* has been frequently denied in *England*. *Doe*, ex dem. *Hodson*, v. *Staple*, 2 *Term Rep.* 695, 696. *Bauerman* v. *Radenius*, 7 *Term Rep.* 663. *Goodtitle*, ex dem. *Jones*, v. *Jones*, 7 *Term Rep.* 50. *Alpass* v. *Watkins*, 8 *Term Rep.* 516. Further, the defendants having made advances to the *cestuy que trust*, in *Btotomley* v. *Brooke*, may be considered in the nature of an *accord* with the *authorized agent* of the plaintiff. But suppose the defendant had pleaded a discharge from the plaintiff; could the *cestuy que trust* sue the defendant at *law* for the fraud? *That* would compare with the principal case; but nothing like it is to be found in the *English* books.

The plaintiff certainly does not stand on better ground than if there had been a judgment in the former suit giving effect to the release. Suppose such judgment to have been rendered; could the plaintiff deprive the defendant of the fruits of it, in another action? *Bostwick* v. *Lewis*, 2 *Day*, 447.

2. The plaintiff has no remedy: first, because the defendant has done no wrong, no fraud; secondly, if fraud, no damage; thirdly, because a recovery would be no bar to an action on the covenant.

First, there was no wrong in law or equity. *Taylor* had a perfect right to give, and *Wolcott* to accept, the discharge. We will here premise, that *Taylor's* having *assigned* makes no difference as to *these* parties. Suppose, then, *Taylor* had not assigned. He and *Coleman* were *joint covenantees*. As to their interest in the covenant, they were, *ex natura rei*, partners. If they were not, a release by one would not *bar* the other. And it is of no consequence, that the declaration alleges that no copartnership ever subsisted between them. The *facts* are given. Whether those facts show a copartnership, or not, is a question of law; and the legal inference is

opposed to the averment. Nor is the allegation that they had agreed to hold each an equal part of the land, for the separate benefit of each, of more avail. The question is, what is the *covenant?* If they were jointly interested in the covenant, they are partners *quoad hoc,* notwithstanding any collateral agreement.

Suppose *A.* and *B.* are partners; *B.* sells the stock to *J. S.* with intent to retain the money, *J. S.* knowing it. What remedy has *A.* against *J. S.?* His remedy clearly would be against *B.* only.

Where the executor released a debt devised to another person, it was holden, on a bill brought against the executor and debtor, to be relieved against the release, charging them with practice, &c. that the devisee was without remedy. 18 *Vin. Abr.* 304. *pl.* 18.

But it is claimed that there was a *severance* of the joint right, by the assignment to *Gilbert,* and settlement with him; and that *Wolcott's* taking a release afterwards from *Taylor* was, therefore, a wrong. Admitting that *Coleman* might, after the assignment, sue alone on the covenant, this only proves, that where one has received satisfaction, the other having the *legal* right, may recover his share, in a suit on the original cause of action, against the party originally liable; *i. e.* that the *whole duty* is not discharged by the satisfaction of *one's share.* Does this show, that where one has received satisfaction for the *whole duty,* the other may still maintain an action? Further, if there was an entire severance, the release does not affect *Coleman,* and, on that ground, no wrong has been done. If the release would bar, there was no severance; if it would not bar, then clearly there is no cause of action.

Again, was the covenant to convey land to *Coleman* and *Taylor severable,* so as to oblige *Wolcott* to convey to *Coleman* and *Gilbert?*

Secondly, if there was a fraud committed, still there was *no damage;* and it will not be contended, at this day,

June, 1809.

COLEMAN
v.
WOLCOTT.

that fraud, without damage, will support an action. The injury was not complete. The release had not become effective. Suppose *A.* forges a note in the name of *B.;* can *B.* recover for the injury, before he has been sued upon the note? Or, suppose a *suborned* witness swears, and then the plaintiff *withdraws* his action; can such plain- tiff recover for any injury he has sustained by the false swearing? Or, suppose another case, which will furnish a decisive test of the principle: Suppose *Coleman* had recovered in his first action; where would be the injury?

Thirdly, a recovery in this action would not bar a suit on the covenant. The causes of action are not similar, or concurrent. 6 *Co.* 7. 4 *Bac. Abr.* 116. Suppose there had been judgment on the release for the defendant, in the first action; would *that* bar this, if the *res gesta* were actionable; *i. e.* supposing all *other* objections removed?

BY THE COURT. The questions arising in this case are, whether the plaintiff has shown any cause of action; and if he has, whether he has remedy at law.

It is alleged in the declaration, that the defendant, with an intent to defraud the plaintiff of certain sums of money advanced on a covenant set forth in the declaration, obtained from *Taylor*, a joint covenantee with the plain- tiff, a release, by which he, the defendant, was discharged from such covenant, knowing that *Taylor* was a bank- rupt, and that such money was justly due to the plain- tiff. The plaintiff stands on the same footing as the assignee of a note, where the maker obtains a dis- charge from the assignor, knowing him to be a bankrupt, and having notice of the assignment. The plaintiff had in equity as strong a claim for the money advanced by him on the covenant as the assignee of a note has to the money due upon it; and it was as fraudulent for the defendant to obtain a release from the joint covenantee, as for the maker to obtain a discharge from the assignor of a note.

The release entirely extinguished the right of the plaintiff by force of the covenant, without the judgment

of a court; and the pleading of it in bar of the action was sufficient evidence of the *intent* of the defendant to avail himself of it.

Formerly, in similar cases, it was holden, that relief could be obtained by bill in equity only; but courts of law have adopted the same principle, and suits have been entertained for such injuries, not only without experiencing any inconvenience, but with general acquiescence and approbation. So long and uniform has been this practice, that it is deemed a part of our common law.

When principles have been settled by the practice, and sanctioned by the experience of courts of chancery, it is highly expedient to incorporate them with the legal code, in cases where the same relief can be furnished. This has long been the usage of courts of law; and they have borrowed many important and valuable improvements from that source.

It might as well be insisted that we should retrace our steps, and furnish relief in chancery only, in all the other instances where courts of law have adopted their principles, as in the case under consideration. But such a fluctuation between law and equity would be productive of the greatest inconvenience, uncertainty and confusion.

For these reasons, we are of opinion, that an action for this injury is sustainable at law.

Judgment reversed.

After the above decision, *Daggett* stated that a motion for a new trial had been made, at the same time with the motion in arrest, in the court below. He therefore moved, that the cause should be remanded, to be proceeded with in the court below, in the same manner as though the motion in arrest had never been made. The court remanded the cause accordingly.